UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS WHITAKER,

       Plaintiff,                            Case No. 10-10599

v.                                      Hon. Gerald E. Rosen

U.S. SECURITY ASSOCIATES, INC.,

       Defendant.

_____/

OPINION AND ORDER DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____March 31, 2011_____

PRESENT:  Honorable Gerald E. Rosen
Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Thomas Whitaker commenced this action in Wayne County Circuit Court on January 27, 2010, alleging that his employer, Defendant U.S. Security Associates, Inc., violated the Michigan Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.361 *et seq.,* by retaliating against him for notifying the federal Transportation Security Administration ("TSA") about security concerns he had observed while performing his job as a security officer at Detroit Metropolitan Wayne County Airport ("DTW").[1]

_____

[1]Plaintiff also asserted a claim of religious discrimination in his complaint, but he has since voluntarily dismissed this claim.

Defendant removed the case to this Court on February 11, 2010, citing the parties' diverse citizenship.  *See* 28 U.S.C. §§ 1441(a), 1332(a).

By motion filed on July 30, 2010, Defendant now seeks summary judgment in its favor on Plaintiff's claim under the WPA.  In particular, Defendant contends (i) that Plaintiff did not engage in protected activity that could support his claim of retaliation; (ii) that, even if he engaged in protected activity, the record fails to establish the requisite causal link between this activity and the adverse employment actions he suffered; and (iii) that, even assuming Plaintiff has establish a *prima facie* case of retaliation, he has failed to show that Defendant's stated, non-retaliatory reason for disciplining him was a mere pretext for unlawful retaliation.  In a response filed on August 20, 2010, Plaintiff challenges each of these contentions, arguing that he has produced sufficient evidence to permit his retaliation claim to proceed to trial.  On September 3, 2010, Defendant filed a reply in further support of its motion.

Having reviewed the parties' briefs in support of and opposition to Defendant's motion, as well as their accompanying exhibits and the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendant's motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on this motion.

## II.  FACTUAL BACKGROUND

2

In June of 2007, Plaintiff Thomas Whitaker was hired as a security officer by Nation Wide Security, the predecessor-in-interest to Defendant U.S. Security Associates, Inc.  In March of 2009, Plaintiff was transferred to a position at Detroit Metropolitan Wayne County Airport ("DTW"), where he worked pursuant to Defendant's contract with the Wayne County Airport Authority ("WCAA") to provide security services at DTW.  In his position at the airport, Plaintiff was responsible for responding to and investigating alarms at various buildings, as well as inspecting and patrolling the perimeter surrounding the Air Operations Area ("AOA"), the secure area of the airport that is restricted to authorized personnel.

A.      **Plaintiff's Reports of Security Concerns to His Supervisor and the TSA**

At some point in the spring or summer of 2009, Plaintiff was alerted by maintenance workers to a possible security concern at one of the gates leading into the AOA.  Specifically, the maintenance box for this gate was located on the "public," non-secure side of the gate, and a switch inside the box allowed maintenance workers to open the gate and gain access to the AOA.  (*See* Plaintiff's Response, Ex. A, Plaintiff's Dep. at 167-70.)  Upon learning of this issue, Plaintiff reported it to his immediate supervisor, Kevin Sanders, and he continued to raise this matter with Sanders over the remainder of 2009, but Sanders never informed Plaintiff of any action he took on this report.  (*See id.* at 191-93, 202.)  Similarly, at some point later in 2009, Plaintiff raised this security concern with another immediate supervisor, Monica Gross, but he once again was never told of

any follow-up actions Gross might have taken.  (*See id.* at 193-96, 202.)[2]

On December 28, 2009, Plaintiff sent an e-mail to the Transportation Security Administration ("TSA"), advising this federal agency of his concerns regarding the publicly accessible maintenance box and another security-related matter, and asking for information relating to these concerns:

> I have a few questions regarding vehicle checkpoint regulations at DTW.  I have noticed at a gate leading to the AOA the main switch to open the gate i[s] on the public side.  Meaning anyone can open the box and turn the switch to allow access to anyone.  Second the vehicle checkpoints that are closed at night have the arm gates in a[n] up position.  Giving anyone the opportunity to gain access with no guard to validate the I.D.  I do have some questions on the regulations.  If you could give me some information (contacts, or regulation and law titles) pertaining to my statements and question it would be appreciated.

(Plaintiff's Response, Ex. I, 12/28/2009 E-mail.)[3]  On January 4, 2010, Plaintiff received a return e-mail from a TSA customer service manager, stating that the agency was "following up on your concerns for vehicle checkpoint regulations at" DTW, and asking Plaintiff to provide a telephone number so that a TSA regulatory security inspector could contact him "to address your concerns and any other questions you might have." (Plaintiff's Response, Ex. J, 1/4/2010 Email.)

At some point in mid-January of 2010, Plaintiff met with TSA officials to discuss

---

[2]Plaintiff testified at his deposition that he also mentioned his security concerns to two WCAA employees, who took no action as far as he was aware.  (*See id.* at 204-05.)

[3]As noted in Plaintiff's response brief, this e-mail was sent just a few days after the so-called "Christmas Day bomber" incident, in which a passenger on a plane bound for DTW allegedly attempted to detonate a bomb hidden in his underwear.

4

the matters raised in his December 28 e-mail and other security concerns.  At this meeting, the officials provided Plaintiff with some documentation regarding the regulations he had referenced in his e-mail.  The TSA officials advised Plaintiff that the agency would investigate his concerns, but Plaintiff has not heard anything further from the TSA since this interview.[4]

## B.    Plaintiff's Discipline and Transfer Following His Report to the TSA

On January 11, 2010, the WCAA security director, Janet Baxter, met with Defendant's account manager for the DTW contract, Vickie Futch, and advised her of the e-mail Plaintiff had sent to the TSA.[5]  Baxter testified at her deposition that she told Futch that Plaintiff's e-mail "may be a violation" of the WCAA's contract with Defendant, and that, in her view, Plaintiff should have raised his concerns through "the appropriate chain of command."  (Baxter Dep. at 10.)  Baxter further testified that she did not ask Futch to remove Plaintiff from his position at the airport, but instead brought the matter to Futch's attention to "giv[e] her the opportunity to take — to address the issue."  (*Id.* at 10, 12.)

After her meeting with Baxter, Futch returned to her office and asked to speak with Plaintiff.  During this January 11, 2010 meeting, Plaintiff explained the concerns that led him to send his e-mail to the TSA, and he told Futch that he had previously advised

---

[4]At some point after Plaintiff commenced this suit, the maintenance box referenced in Plaintiff's e-mail to the TSA was moved to a location within the restricted AOA.  The WCAA official who requested this change denied that the relocation of the box was in any way related to the concerns expressed by Plaintiff.  (*See* Plaintiff's Response, Ex. C, Baxter Dep. at 16.)

[5]Baxter learned of this e-mail when a TSA official forwarded it to her.

5

his two supervisors, Sanders and Gross, and two WCAA employees of his security

concerns.  Futch then handed Plaintiff a "Disciplinary Action Report" she had completed

prior to their meeting, and asked him to complete the "Employee Statement" section of

this report.  (*See* Plaintiff's Response, Ex. B, Futch Dep. at 57-58; *see also* Plaintiff's

Response, Ex. K, Disciplinary Action Report.)  Finally, Futch advised Plaintiff that he

was suspended pending a further investigation of the matter.  (*See* Futch Dep. at 58.)[6]

In the portion of the disciplinary report completed by Futch, she stated:

> On December 29, 2009, [Plaintiff] contacted TSA's headquarters in
> Washington, D.C. to inquire about AOA checkpoint regulations.  Not only
> are there posted orders, supervisors, managers and training materials
> available to answer [Plaintiff's] questions and concerns, but there is also
> information in his employee handbook that outlines the proper procedure
> and chain of command when an emp[loyee] is faced with concerns,
> questions or dilemmas.  [Plaintiff] failed to utilize any of these resources
> readily available to him but chose to bypass us all and seek guidance from
> TSA headquarters regarding his job responsibilities and [ . . .][7] suspicion.

(Plaintiff's Response, Ex. K, Disciplinary Action Report.)[8]  In the "Employee Statement"

---

[6]Plaintiff's account of this initial January 11, 2010 meeting differs in certain respects
from Futch's.  First, Plaintiff testified that he was not presented with the Disciplinary Action
Report until the following morning, January 12.  (*See* Plaintiff's Dep. at 207-08.)  Next, Plaintiff
claims that Futch told him at the January 11 meeting that he had been terminated, and not merely
suspended, with Futch advising him that this decision was based upon a concern by airport
officials that he had "g[iven] out security sensitive information."  (*Id.* at 207, 209.)

[7]The Court has been unable to determine the word Futch used in this passage.  The word
appears to be "insighting," and perhaps Futch meant to use the word "inciting."

[8]Futch testified that when she wrote this section of the disciplinary report and presented it
to Plaintiff, she had not yet contacted Plaintiff's supervisors, Sanders and Gross, to determine
whether Plaintiff had in fact notified them about his security concerns.  (*See* Futch Dep. at 56-
57.)  Instead, she contacted these supervisors the next day, and they denied that Plaintiff had
advised them of the security concerns raised in his e-mail to the TSA.  (*See id.* at 58-59.)  Had
these supervisors stated that Plaintiff ***did*** advise them of his concerns, Futch testified that this

6

portion of this report, Plaintiff indicated that he disagreed with Futch's statement, and he

wrote:

> My inquir[y] had nothing to do with my job.  I contacted TSA off
> duty.  I was acting as a concerned citizen of the United States of America.
> My email did not violate any laws.  No security sensitive information was
> given out per TSA investigator.[9]

(Plaintiff's Response, Ex. K, Disciplinary Action Report.)

The day after her meeting with Plaintiff, Futch contacted human resources

manager Kellie Satterfield about this matter, and forwarded her a copy of the e-mail

Plaintiff had sent the TSA and the disciplinary report Futch had prepared and issued to

Plaintiff.  Satterfield responded in an e-mail, stating:

> Vickie, I think removal at client[']s request is good enough.  I know
> [WCAA security director Janet Baxter] didn't state in words that she
> wanted [Plaintiff] removed, but I think her intent is clear.  The reason for
> removal would be that he failed to follow the chain of command in
> reference to security procedures at his job location.  The truth is as a private
> citizen he has the right to do what he did.  As the employer, we have the
> right to remove him and reassign him to another location for any reason.
> Please put in your final reprimand that he must report for reassignment to
> the Southfield Office by 1/18/2010 IN PERSON . . . .  Have his signature
> on that demand so there is no misunderstanding about it.

---

would have raised concerns in her mind "about them carrying out their supervision duties."  (*Id.*
at 59-60.)

[9]In explaining this last portion of his statement, Plaintiff testified that after Futch told him
at the January 11 meeting that he was being discharged for giving out sensitive security
information, he spoke to a TSA official on the telephone later that day and was told that no
security sensitive information was disclosed in his e-mail.  (*See* Plaintiff's Dep. at 207-08.)

(Plaintiff's Response, Ex. P, 1/12/2010 Satterfield E-mail.)[10]

Plaintiff ultimately was reinstated from his suspension, but Defendant determined that he should be transferred to a different location and assigned to work for a different client.  Over the next few weeks, Defendant offered Plaintiff at least two other positions, but Plaintiff rejected one as lower paying and requiring a longer commute and work on the weekends, and the second offer was for a location where Plaintiff would have been required to shave his beard.[11]  Eventually, on February 2, 2010, Plaintiff accepted an offer to work in Defendant's office in Southfield.  Although this position pays the same hourly wage Plaintiff earned at the airport, he testified to his view that he has been placed "in the bottom of the cellar," in a job with far fewer responsibilities than his position at DTW. (Plaintiff's Dep. at 266, 290-92.)

---

[10]Although Satterfield could be viewed in this e-mail as suggesting to Futch a basis for disciplining Plaintiff, Satterfield testified at her deposition that Futch had asked her to confirm Futch's own "chain of command" reason for imposing this discipline, and that her e-mail to Futch was meant only to provide the requested confirmation.  (*See* Defendant's Motion, Ex. 11, Futch Dep. at 28-29.)

[11]Plaintiff has testified that he wears a beard for religious reasons, and he cited Defendant's demand that he shave his beard as the basis for the claim of religious discrimination asserted in his initial complaint.  When Defendant ultimately permitted Plaintiff to keep his beard, Plaintiff voluntarily withdrew this claim.

**C.      The Relevant Provisions in Defendant's Employee Handbook**

As the basis for the "chain of command" reason given for Plaintiff's discipline and

transfer, Defendant cites various provisions in the "Security Officer's Guide" given to

Plaintiff and the company's other security officers.  (*See, e.g.,* Futch Dep. at 64 (stating

that the "chain of command" requirement that Plaintiff was charged with violating "is in

writing," and is found in Defendant's Security Officer's Guide).)  One such provision

states:

> PROBLEM RESOLUTION:  Any Security Officer or employee who
> is dissatisfied with his treatment as a Security Officer may file a complaint.
> The Security Officer must first follow the chain of command by reporting
> the matter to his (in the order indicated):
>
> •      Immediate Supervisor (shift leader, site/project manager,
>        field/patrol supervisor)
>
> •      Operations Supervisor (at operating unit/branch level)
>
> •      Operations Manager (at operating unit/branch level)

(Plaintiff's Response, Ex. F, Security Officer's Guide § 3.1.2.)  The immediately

following provision states that "[i]f the above management representatives fail to provide

satisfactory resolution, then the Security Officer may file a formal complaint in writing to

the Branch/District Manager."  (*Id.* §  3.1.2.1.)[12]

A separate provision in the Guide permits security officers to report issues directly

---

[12]Another provision permits a security officer to bypass the full chain of command and
contact the Branch/District Manager directly "[i]n those extreme circumstances where the
Branch/District Manager should be made aware of problems impacting [Defendant's] services to
our client, or where the supervisor has refused to take action."  (*Id.* § 3.1.2.2.)

to governmental agencies:

> If a USA employee has a concern with regard to a USA environmental/safety/health issue or an issue of fraud/waste/abuse, the employee may direct his concern to the appropriate governmental agency responsible for resolution of such issues and/or problems but not to the client.

(*Id.* § 3.1.4.)

At her deposition, account manager Vickie Futch acknowledged that Plaintiff was permitted under the last of these guidelines, § 3.1.4, to report a safety concern directly to the TSA.  (*See* Futch Dep. at 67.)  Futch further testified that Plaintiff had correctly adhered to this policy in making his e-mail report to the TSA, and that this provision, standing alone, did not require that Plaintiff raise his security concerns through the chain of command.  (*See id.* at 67-68, 75.)  Nonetheless, Futch testified that Plaintiff was appropriately disciplined under § 3.1.2 of the Security Officer's Guide, the provision addressing "problem resolution."  (*See id.* at 66-68, 75.)  While Futch conceded that Plaintiff had not complained of "his treatment as a Security Officer" within the meaning of § 3.1.2, and that this provision, by its literal terms, did not require that safety issues be reported up the chain of command, she nonetheless opined that Plaintiff had "an obligation based on the rules and regulations of this guide, he could contact whoever he wanted to contact, but he also had the obligation to contact his immediate supervisors." (*Id.* at 66-68.)

# III.  ANALYSIS

## A.      The Standards Governing Defendant's Motion

Through the present motion, Defendant seeks summary judgment in its favor on Plaintiff's claim under the Michigan Whistleblowers' Protection Act.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).[13]  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

---

[13]Effective December 1, 2010, Rule 56 has been revised in various respects, but the language quoted here (and immediately below) reflects the Rule as it read when Defendant filed the present motion.  None of the recent amendments to the Rule would materially affect the Court's disposition of Defendant's motion.

11

Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.**     **Issues of Fact Remain as to Whether Defendant Violated the Whistleblowers' Protection Act by Disciplining Plaintiff for Reporting Security Concerns to the TSA Without Also Pursuing These Concerns Through the Company's Chain of Command.**

In Count I of his complaint — the sole count that remains before the Court — Plaintiff asserts a claim under Michigan's  Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.361 *et seq.,* alleging that Defendant retaliated against him for reporting a suspected violation of a law, rule, or regulation to a federal agency, the TSA. The pertinent WPA provision giving rise to this claim states in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to a law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body . . . .

Mich. Comp. Laws § 15.362.

A retaliation claim under the WPA is analyzed under the familiar burden-shifting

12

framework employed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  *See Taylor v. Modern Engineering, Inc.,* 252

Mich. App. 655, 653 N.W.2d 625, 628 (2002); *Cooney v. Bob Evans Farms, Inc.,* 645 F.

Supp.2d 620, 628 (E.D. Mich. 2009).  Under the first step of this tripartite approach,

Plaintiff must establish a *prima facie* case of retaliation based on his whistleblowing

activity.  *Taylor,* 653 N.W.2d at 628.  Once he does so, Defendant has the burden of

articulating a legitimate, non-retaliatory reason for taking adverse action against Plaintiff.

*Taylor,* 653 N.W.2d at 628.  Finally, if Defendant meets this burden of production,

Plaintiff "then has the opportunity to prove that the legitimate reason offered by the

defendant was not the true reason, but was only a pretext" for taking retaliatory action

against him.  *Taylor,* 653 N.W.2d at 628.

### 1.      Plaintiff Has Established a *Prima Facie* Case of Retaliation Against His Protected Whistleblowing Activity.

To establish a *prima facie* case of retaliation under the WPA, Plaintiff must show

(1) that he was engaged in protected activity as defined by the WPA, (2) that he was

discharged or otherwise discriminated against, and (3) that "a causal connection exists

between the protected activity and the discharge or adverse employment action."  *West v.*

*General Motors Corp.,* 469  Mich. 177, 665 N.W.2d 468, 471-72 (2003).  In seeking

summary judgment in its favor on Plaintiff's WPA claim, Defendant challenges

Plaintiff's showing as to the first and third elements of this standard, arguing that

Plaintiff's e-mail to the TSA does not qualify as protected activity under the WPA, and

that he has failed to establish a causal connection between any such protected activity and the disciplinary action taken against him.  The Court finds no merit in these contentions.

The WPA itself defines protected activity as "report[ing]," or being "about to report," a "violation or a suspected violation of a law or regulation or rule promulgated" under local, state, or federal law.  Mich. Comp. Laws § 15.362.[14]  As evidence of the requisite report, Plaintiff points to his December 28, 2009 e-mail to the TSA, in which he stated:

> I have a few questions regarding vehicle checkpoint regulations at DTW.  I have noticed at a gate leading to the AOA the main switch to open the gate i[s] on the public side.  Meaning anyone can open the box and turn the switch to allow access to anyone.  Second the vehicle checkpoints that are closed at night have the arm gates in a[n] up position.  Giving anyone the opportunity to gain access with no guard to validate the I.D.  I do have some questions on the regulations.  If you could give me some information (contacts, or regulation and law titles) pertaining to my statements and question it would be appreciated.

(Plaintiff's Response, Ex. I, 12/28/2009 E-mail.)  In Defendant's view, this e-mail fails to meet the statutory standard for protected activity, as it merely raised questions and sought information, rather than identifying a violation or suspected violation of a rule, regulation, or law.

The Court cannot agree.  Plaintiff's e-mail identifies two specific security

_____

[14]In addition, this report or effort to report must be directed at a "public body," but Defendant does not contest that the TSA qualifies as a "public body" within the meaning of the WPA.  *See Ernsting v. Ave Maria College,* 274 Mich. App. 506, 736 N.W.2d 574, 583 (2007) (holding that the U.S. Department of Education is a "public body" under the WPA); *Robinson v. Radian, Inc.,* 624 F. Supp.2d 617, 628-29 (E.D. Mich. 2008) (concluding that the federal Office of Federal Contracts Compliance Programs is a "public body").

concerns:  (i) that a switch to open one of the gates to the secure AOA at the airport was placed in a location that was "access[ible] to anyone," and (ii) that certain vehicle checkpoint gates were left in their "up" position when the checkpoints were left unattended at night.  Although Plaintiff indicated in his e-mail that he had "questions" regarding these two security concerns, these questions were expressly directed at the "regulations" governing vehicle checkpoints at the airport, with Plaintiff presumably seeking to learn more about the regulations bearing upon the two security concerns he had identified.

Viewed in its totality, then, the meaning of (and intent behind) Plaintiff's e-mail seems reasonably clear.  He advised the TSA of two potential points of vulnerability in the security measures used to ensure that only authorized personnel could gain access to the AOA.  He also posed "questions regarding vehicle checkpoint regulations at DTW," presumably so that he could further explore his suspicions and concerns that the vulnerabilities he cited might run afoul of these regulations.  Finally, he sought "information . . . pertaining to my statements and question," evidently seeking to open a dialogue with the TSA regarding his security concerns.  In the Court's view, this fits comfortably within the statutory requirement of a "report" of security concerns that Plaintiff suspected might violate vehicle checkpoint regulations governing the airport and access to the AOA.

Significantly, both the TSA and Defendant's own management evidently construed Plaintiff's e-mail as raising concrete security concerns that warranted further

15

investigation, and not as merely seeking information or posing vague questions.  A TSA representative promptly contacted Plaintiff and arranged an interview, during which the agency did not simply provide information or copies of regulations governing airport security, but also inquired about the specific security concerns identified in Plaintiff's e-mail and promised to investigate these matters.  (*See* Plaintiff's Dep. at 187-89.)  Similarly, Defendant's account manager for the DTW contract, Vickie Futch, characterized her meeting with WCAA security director Janet Baxter regarding Plaintiff's e-mail as addressing Plaintiff's action of "contact[ing] an outside agency with his security concerns," and she also agreed that Plaintiff had, in fact, reported a safety concern to the TSA.  (Futch Dep. at 48-49, 67.)  Moreover, Futch acknowledged that she was "a bit concerned" about the security vulnerabilities raised by Plaintiff, and that, to address these concerns, she and a training supervisor visited the sites identified by Plaintiff and "checked everything out that he was concerned about."  (*Id.* at 63-64, 73.)[15]  These reactions engendered by Plaintiff's e-mail, then, surely belie Defendant's contention that Plaintiff merely posed questions and sought information in his communication to the

---

[15]Interestingly, Futch testified that she perceived no urgent need to look into Plaintiff's concerns because his e-mail had gone to the TSA and the WCAA, so that "[i]f there were these big issues [cited by Plaintiff], they would have been handled immediately by those entities."  (*Id.* at 72-73.)  This, of course, is presumably what motivated Plaintiff to notify the TSA regarding his security concerns, and Defendant does not deny that it was appropriate for him to do so.  In addition, while Futch testified that her investigation of Plaintiff's concerns revealed that they had "no validity," and that "[n]o changes at all" had been made at the airport in the wake of Plaintiff's concerns, (*id.* at 63-64, 73-74), the Court noted earlier that the maintenance box referenced in Plaintiff's e-mail has since been moved to a location within a restricted area.

16

TSA.[16]

The excerpts of Plaintiff's deposition testimony cited by Defendant do not warrant a different conclusion.  In particular, Defendant points to a passage in Plaintiff's testimony where he "admitted that he did not state anywhere in the e-mail that he believed there was any violation of law."  (Defendant's Motion, Br. in Support at 13 (citing Plaintiff's Dep. at 185).)  Yet, the WPA does not require an explicit accusation of illegality, but instead encompasses reports of a "suspected" violation of a law, rule, or regulation.  Mich. Comp. Laws § 15.362; *see also Robinson,* 624 F. Supp.2d at 631 (noting that "the WPA protects reports of 'suspected' violations of the law, not only true or ultimately proven violations of the law"); *Smith v. Gentiva Health Services (USA) Inc.,* 296 F. Supp.2d 758, 762 (E.D. Mich. 2003) (observing that a report of a "suspected violation of the law is judged on a subjectively reasonable standard:  the employee must have been acting in good faith and been subjectively reasonable in the belief that the conduct was a violation of the law"); *Melchi v. Burns International Security Services,*

---

[16]Indeed, Defendant's "chain of command" rationale for disciplining Plaintiff is seemingly at odds with the notion that Plaintiff's e-mail to the TSA merely posed questions and sought information.  In the disciplinary notice issued to Plaintiff arising from this incident, Plaintiff was faulted for "bypass[ing]" the "proper procedure and chain of command," and instead "seek[ing] guidance" from the TSA regarding the "questions and concerns" raised in his e-mail.  (Plaintiff's Response, Ex. K, Disciplinary Action Report.)  At her deposition, Futch acknowledged that Plaintiff was permitted under company policy to report his safety concerns to the TSA, but she explained that she was disciplined for not ***also*** pursuing these concerns up the company chain of command.  (*See* Futch Dep. at 66-68, 75, 91-92.)  Yet, if Plaintiff was merely seeking information from a government agency about a matter within its purview and expertise, it is difficult to see how such an inquiry could have triggered Plaintiff's duty to invoke Defendant's internal "problem resolution" policy with its attendant "chain of command" requirement.

17

*Inc.,* 597 F. Supp. 575, 583 (E.D. Mich. 1984) (holding that the plaintiff had engaged in

protected activity so long as he "held a subjective good faith belief that his employer had

violated the law").  More generally, the Michigan Supreme Court has emphasized that an

employee is not "required to say 'magic words' in order to reap the protections of the

statute."  *Shallal v. Catholic Social Services,* 455 Mich. 604, 566 N.W.2d 571, 577

(1997); *see also Cooney,* 645 F. Supp.2d at 630.

In this case, Plaintiff has testified that when he sent his e-mail to the TSA, he

suspected that the airport authority, or perhaps his employer, was in violation of the

regulations governing vehicle checkpoints.  (*See* Plaintiff's Dep. at 180-84, 283-84.)[17]

Moreover, the e-mail sent by Plaintiff sufficiently conveyed these suspicions, as it

identified specific security vulnerabilities at the airport and inquired whether these

conditions at the perimeter of the AOA implicated the vehicle checkpoint or other

regulations governing the airport.  Under this record, the Court is satisfied that Plaintiff's

---

[17]While Defendant points to Plaintiff's acknowledgment at his deposition that he did not know or have any specific basis to believe that Defendant had violated any such regulations, (*see* Plaintiff's Dep. at 182-83), the protection of the WPA is not limited to "reported violations of the employer alone," but rather extends to reports of violations (or suspected violations) by others. *Dolan v. Continental Airlines/Continental Express,* 454 Mich. 373, 563 N.W.2d 23, 28 (1997). Moreover, to the extent Defendant suggests that a whistleblower must identify more specifically the law, rule, or regulation he suspects has been violated, it cites no authority for this proposition, nor is the Court aware of any.  *Cf. Melchi,* 597 F. Supp. at 583-84 (finding that it was "eminently reasonable" for the plaintiff to believe that the "destruction and/or falsification of reports and records" cited in his letter to the NLRB "would constitute a violation of a law, rule or regulation," in light of "the pervasive regulation of the nuclear power industry by a host of state and federal agencies").  Surely, it would have been reasonable for Plaintiff to believe that the TSA was far more knowledgeable than he was about the regulations governing airport security, so that there was no particular need for him to research these regulations before bringing his security concerns to the agency's attention.

e-mail to the TSA qualifies as a report of a "suspected violation of a law or regulation or rule" within the meaning of the WPA.

The cases cited by Defendant as purportedly defeating Plaintiff's claim of protected activity are readily distinguishable.  In *Nair v. Oakland County Community Mental Health Authority,* 443 F.3d 469, 472 (6th Cir. 2006), the only "protected activity" identified by the plaintiff was a letter to a supervising board complaining about the diminished responsibilities of his position and closing with a vague reference to his "serious concerns about my legal, ethical and moral obligations."  In affirming the dismissal of the plaintiff's claim under the WPA, the court briefly observed that "[n]owhere in the letter does [the plaintiff] report a violation or suspected violation of the law."  *Nair,* 443 F.3d at 480.  Similarly, in *Demaagd v. City of Southfield,* No. 267291, 2006 WL 2312086, at *3-*4 (Mich. Ct. App. Aug. 10, 2006), the court found that the plaintiff in that case had not reported a suspected violation of law merely by furnishing newspaper clippings to city officials without explaining how these materials evidenced a violation or suspected violation of the city charter.  Finally, in *Colenburg v. Starcon International, Inc.,* 656 F. Supp.2d 947, 955-56 (D. Minn. 2009), the court stated that it "need not linger long" on the plaintiff's claim under a Minnesota whistleblower protection statute, where the only protected activity cited by the plaintiff was his request for a laminated copy of a safety manual that he "admittedly already possessed, just not in laminated form."

The common feature in each of these cases is that the plaintiff failed to take even a

19

modest step toward identifying and reporting a suspected violation of a law, rule, or regulation.  Here, in contrast, Plaintiff identified specific concerns with the adequacy of the security perimeter surrounding the AOA at the airport, and he sufficiently conveyed his suspicion that these security deficiencies implicated the vehicle checkpoint or other airport regulations.  The recipients of Plaintiff's report — including the TSA, the WCAA, and Defendant — had no difficulty in perceiving that he was raising security concerns, and each of these entities looked into these concerns.  Under these circumstances, and as explained above, the Court finds that Plaintiff's e-mail to the TSA constituted a report of a suspected violation of the rules and regulations governing security at DTW.

Next, Defendant argues that Plaintiff has failed to establish the requisite causal connection between his e-mail and the discipline imposed on him.  Rather, in Defendant's view, the "undisputed evidence" shows that Plaintiff was disciplined "for failing to raise his questions up the chain of command."  (Defendant's Motion, Br. in Support at 14.)  Yet, this reason given by Defendant is the very same reason identified by Defendant to discharge its burden of production under the second step of the *McDonnell Douglas* inquiry.  This Court and others have cautioned against "impermissibly conflat[ing]" the first two stages of the *McDonnell Douglas* analysis, and thereby requiring a plaintiff to disprove the defendant employer's stated basis for its action in order to prove a *prima facie* case.  *See, e.g., White v. Columbus Metropolitan Housing Authority,* 429 F.3d 232, 242-43 & n.6 (6th Cir. 2005); *Cicero v. Borg-Warner Automotive, Inc.,* 280 F.3d 579, 585 (6th Cir. 2002); *Antonio v. Michigan Department of Treasury,* No. 06-15653, 2009 WL

20

2926495, at *4 n.11 (E.D. Mich. Sept. 10, 2009).  So it is here, where Defendant's "chain of command" justification for disciplining Plaintiff is more properly addressed in the final two steps of the *McDonnell Douglas* analysis.

Once this explanation for Defendant's action is excluded from the inquiry, the Court readily concludes that Plaintiff has established the requisite causal connection between his protected activity and the disciplinary action taken against him.  First, there was not merely close but ***immediate*** temporal proximity between Plaintiff's protected activity and his employer's action in response, with Defendant issuing a disciplinary notice against Plaintiff the very same day it learned of Plaintiff's e-mail to the TSA.  Moreover, while the Court recognizes that Defendant seeks to draw a distinction between Plaintiff's exercise of protected activity and the "chain of command" basis for disciplining him, the fact remains that ***but for*** Plaintiff's e-mail to the TSA, there would have been no violation of Defendant's "chain of command" requirement.  This violation, after all, arose from Plaintiff's decision to communicate his security concerns to the TSA without ***also*** raising these concerns through the chain of command at his workplace.  Thus, although Defendant certainly is entitled to disclaim Plaintiff's protected activity as a ***motive*** for its disciplinary action, it cannot deny that this protected activity was the underlying ***conduct*** that led to Plaintiff's discipline.  This close and inextricable interrelationship between Plaintiff's protected activity and his discipline suffices to establish the "causal connection" element of a *prima facie* case under the WPA.

      **2.**      **Plaintiff Has Raised Issues of Fact as to Whether the Reason Given by**

**Defendant for Disciplining Him Was a Pretext for Unlawful Retaliation.**

Once Plaintiff has established his *prima facie* case, Defendant bears the burden of articulating a legitimate, non-retaliatory reason for the discipline imposed upon Plaintiff. *See Taylor,* 653 N.W.2d at 628. In this case, Defendant has satisfied this burden by citing Plaintiff's communication of his security concerns to the TSA without also pursuing them up the company chain of command, as purportedly required under § 3.1.2 of Defendant's Security Officer's Guide.[18]

Accordingly, the burden returns to Plaintiff to show that "the legitimate reason offered by the defendant was not the true reason, but was only a pretext" for the adverse action taken against him. *Taylor,* 653 N.W.2d at 628. "A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Roulston v. Tendercare (Michigan), Inc.,* 239 Mich. App. 270, 608 N.W.2d 525, 530 (2000).

Plaintiff contends, and the Court agrees, that Defendant's proffered explanation is unworthy of credence in two respects. First, Defendant insists that its "chain of command" justification for disciplining Plaintiff is mandated under a plain reading of § 3.1.2 of its Security Officer's Guide. Indeed, both the principal decision-maker who

---

[18]There is a potentially troublesome aspect to this reason given by Defendant, and the Court returns to this matter below.

22

imposed the discipline in question, account manager Vickie Futch, and human resources manager Kellie Satterfield testified unequivocally that Plaintiff's discipline rested solely upon his violation of this provision. (*See* Futch Dep. at 64-66, 75; Satterfield Dep. at 29.) Futch went further, testifying that, to her knowledge, no employee had ever been suspended, placed on probation, or reprimanded if they properly adhered to this and the other policies set forth in the Security Officer's Guide, and affirming that she had never disciplined an employee who had followed these guidelines. (*See* Futch Dep. at 38, 74.)

A reasonable trier of fact could conclude that Defendant's claimed reliance on its Security Officer's Guide as a basis for disciplining Plaintiff is unworthy of credence. As noted earlier, the provision relied upon by Defendant instructs an employee to proceed through the specified "chain of command" when expressing "dissatisf[action] ***with his treatment as a Security Officer.***" (Security Officer's Guide § 3.1.2 (emphasis added).) As account manager Futch conceded at her deposition, Plaintiff's e-mail to the TSA raised no complaints about or dissatisfaction with his treatment as a security officer. (*See* Futch Dep. at 66.) Futch further acknowledged that § 3.1.2 does not, on its face, require an employee to proceed through the chain of command for complaints or concerns that do not implicate the employee's treatment at the workplace, such as the security concerns cited in Plaintiff's e-mail to the TSA. (*See id.* at 66, 68.) Finally, Futch agreed that the provision under which Plaintiff was authorized to communicate safety concerns directly to the TSA, § 3.1.4, does ***not*** require that an employee proceed through the chain of command, and she acknowledged that Plaintiff had fully complied with this provision.

23

(*See id.* at 67-68, 75.)  Under this record, a trier of fact could reasonably question Defendant's stated reliance on written policies that, by their express terms, simply do not impose the "chain of command" requirement Plaintiff was charged with violating.

To be sure, Defendant cites the deposition testimony of supervisory and management personnel who express their understanding that the "chain of command" requirement applied equally to all complaints, issues, and concerns, whether with regard to treatment in the workplace or otherwise.  (*See, e.g.,* Futch Dep. at 66; Defendant's Reply, Ex. 4, Herrera Dep. at 52-53; Defendant's Reply, Ex. 14, Sanders Dep. at 28-30.) Defendant also points to Plaintiff's deposition testimony that nobody ever told him he could pursue ***only*** complaints of mistreatment through the chain of command, and not other issues or concerns.  (*See* Plaintiff's Dep. at 199.)  Yet, while Defendant certainly can present this evidence in an effort to persuade the trier of fact that it did, in fact, rely on a reasonable interpretation of § 3.1.2 of the Security Officer's Guide that was widely understood throughout the workplace as applicable to all manner of complaints and concerns, the Court cannot say that a trier of fact would be compelled to view the evidence in this way.[19]

_____

[19]Defendant further cites this Court's recognition in another case that "an employer's 'honest belief' in a proffered reason for a challenged employment action will be upheld against a charge of pretext, even if this belief cannot be proven true, so long as the employer can identify 'particularized facts' upon which it relied in forming this belief."  *Nizami v. Pfizer Inc.,* 107 F. Supp.2d 791, 804 (E.D. Mich. 2000) (citation omitted).  Yet, this "honest belief" standard encompasses only the ***facts*** relied upon by an employer in making its challenged decision, and does not extend to the "belief" cited by Defendant here — namely, its interpretation of its company policy as extending beyond its plain language limiting its reach to an employee's complaints about his "treatment as a Security Officer."

24

Next, even if one accepts that Defendant properly *could* have been motivated by its interpretation of company policy as mandating that all complaints be pursued through the chain of command, there would remain questions of fact as to whether Defendant *actually acted* on this basis.  First, Plaintiff has testified that he was initially told by Futch that he was being disciplined for divulging "security sensitive information" in his e-mail to the TSA, and that Futch then settled upon the "chain of command" justification after he advised her that, according to the TSA, his e-mail included no such sensitive information. (*See* Plaintiff's Dep. at 207-10.)  In deciding Defendant's summary judgment motion, the Court must credit this testimony as to Defendant's changing rationale for its action.

The record also provides other grounds to question Defendant's true motivation for disciplining Plaintiff.  In an January 12, 2010 e-mail to Vickie Futch, for example, human resources manager Kellie Satterfield stated her view that "removal at client[']s request is good enough," suggesting that the "intent" of WCAA security director Janet Baxter was "clear" that "she wanted [Plaintiff] removed."  (Plaintiff's Response, Ex. P, 1/12/2010 E-mail.)[20]  Although Baxter testified at her deposition that she did not ask Futch to remove Plaintiff from his position at the airport, she acknowledged that she met with Futch to "giv[e] her the opportunity to take — to address the issue" arising from Plaintiff's e-mail to the TSA.  (Baxter Dep. at 10, 12.)  Moreover, Futch has testified as to the message she

---

[20]Futch confirmed at her deposition that she understood Satterfield to be referring to Baxter as the individual whose "intent" was "clear" as to Plaintiff's removal.  (*See* Futch Dep. at 100.)

perceived Baxter as sending, explaining:

> What I told Kellie [Satterfield] was basically this is our client.  We're
> looking to have service satisfaction.  If she's concerned that there is a
> problem with my officers and me or my officers and my supervisors that's
> going to bring about some concern of service, then the best thing we should
> do in a business mind is put [Plaintiff] somewhere else.

(Futch Dep. at 101.)  Futch further testified that she was "concerned with the way the

client feels about our service," and that what she heard from the client in this instance was

the concern that "your people [are] skipping you and going straight to other folks" with

their security concerns.  (*Id.* at 102-03.)  All of this, then, raises a question whether

Plaintiff was disciplined for a "chain of command" violation, or in order to appease a

dissatisfied client.

Finally, Satterfield's January 12, 2010 e-mail to Futch raises another potential

issue of fact as to the veracity of Defendant's stated basis for disciplining Plaintiff.  After

citing "removal at client[']s request" as a ground for removing Plaintiff from his position

at the airport, Satterfield states that "[t]he reason for removal would be that he failed to

follow the chain of command in reference to security procedures at his job location."

(Plaintiff's Response, Ex. P, 1/12/2010 E-mail.)  A trier of fact could reasonably view this

statement as Satterfield's suggestion of a legitimate ground Futch could cite as a basis for

a disciplinary action she had already decided to impose, presumably on another ground.

As noted earlier, Satterfield has testified that she was not suggesting a reason to Futch,

but was merely confirming the validity of the reason previously identified by Futch.  (*See*

Satterfield Dep. at 28-29.)  Again, however, it must be left to the trier of fact to decide

26

whether to credit Satterfield's explanation for the language she used in her e-mail to Futch.

Before leaving this matter, the Court must confess that it is troubled by the nature of the "chain of command" reason given by Defendant for disciplining Plaintiff.  As discussed, Defendant acknowledges Plaintiff's right to communicate his safety and security concerns to the TSA, but it faults him for failing to *also* pursue these concerns through the chain of command at his workplace.  In essence, then, Defendant seeks to impose internal procedural requirements upon the manner in which its employees report security concerns and suspected violations to the appropriate outside authorities.  This threatens to weaken the protections afforded by the Michigan WPA, as it seemingly makes these protections contingent upon an employee's compliance with internal workplace procedures that *must* be followed when the employee reports his suspicions of a violation of a law, rule, or regulation.  The Michigan statute, of course, mandates no such procedures, and it strikes the Court as problematic to allow a private employer to interpose itself between its employees and the outside agencies charged with investigating the violations identified by one of these employees.  To be sure, an employer may legitimately urge its employees to raise such concerns *both* internally *and* to the appropriate outside agency.  It is a more difficult question, however, whether an employer may *insist upon* such a procedure, and may discipline a worker who fails to proceed in the manner preferred by the employer.  Although the Court need not resolve this question in order to decide Defendant's motion, it is by no means convinced that the reason

27

identified by Defendant here as justification for disciplining Plaintiff should be recognized as a legitimate, non-retaliatory basis for taking adverse action against an employee who has engaged in protected activity under the WPA.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's  July 30, 2010 motion for summary judgment (docket #14) is DENIED.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  April 1, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 1, 2011, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager

28